**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DELOITTE SERVICES LP, DELOITTE DEVELOPMENT LLC, and DELOITTE CONSULTING LLP,<br><br>Plaintiffs,<br><br>v.<br><br>ARTUR NIYAZOV, OASIS ACTION LLC, and DOES 1 to 10, inclusive,<br><br>Defendants. | Case No. 1:26-cv-10041<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Deloitte Services LP, Deloitte Development LLC, and Deloitte Consulting LLP (collectively, "Deloitte" or "Plaintiffs") bring this action against Defendants Artur Niyazov ("Niyazov") and Oasis Action LLC ("Oasis Action" and, together, "Defendants"), and allege as follows:

## INTRODUCTION

1. Deloitte files this lawsuit against Niyazov, a former contractor, to recover, and to prevent the use and disclosure of, thousands of confidential Deloitte files—including trade secrets concerning Deloitte's proprietary AI platform—that he secretly copied from his Deloitte-issued laptops onto personal devices in violation of Deloitte policies, security controls, and his contractual obligations.

2. Through significant investments of money and human capital, Deloitte designed and built its proprietary AI product as a proprietary enterprise platform in which autonomous AI agents carry out end-to-end business processes—analyzing a client's data, reasoning over it, and taking action in the client's systems—using an agent architecture, prompt libraries, data models, security controls, and deployment methodology that Deloitte developed itself and does not disclose outside the firm.

3. In March 2026, Deloitte engaged Niyazov, through a staffing agency, to lead Deloitte's proprietary AI product's Forward Deployed Engineering function, which deploys Deloitte's proprietary AI product for Deloitte's clients. That role gave Niyazov access to some of Deloitte's most sensitive and competitively valuable information about Deloitte's proprietary AI product, including its technical architecture, product requirements and roadmaps, prompt libraries, data dictionaries, deployment methodologies, and pricing strategy.

4. As a condition of his engagement, Niyazov signed an Agreement Regarding Disclosure of Confidential and Personally Identifiable Information and Ownership of Work Product (the "Confidentiality Agreement"). A copy of the Confidentiality Agreement is attached hereto as **Exhibit A**.

5. In the Confidentiality Agreement, Niyazov agreed that Deloitte's confidential information "shall be used only to the extent necessary for the performance of [his] Services"; that he "shall not store any PII or Information on a mobile device . . . or other electronic device" other than equipment Deloitte provided to him; and that he "shall not transfer any Information, including, without limitation, any PII, off the Deloitte network." Ex. A §§ 1(a), 2(c).

6. Niyazov violated those obligations almost immediately. Nine days after his engagement began, he started copying Deloitte files onto a two-terabyte microSD card inserted into a Sony digital voice recorder that he connected to his Deloitte laptop. By using the digital voice recorder, Niyazov circumvented Deloitte's security controls that prevent external transfers.

7. Between March 25 and June 16, 2026, Niyazov caused at least 3,293 transfers of files containing Deloitte's confidential information and pertaining to Deloitte's proprietary AI product from Deloitte-issued laptops to the recorder and card.

8. In addition to the recorder and card, Niyazov transferred Deloitte's confidential information onto a USB card reader from his Deloitte MacBook, he connected the card to a non-Deloitte Apple computer, and he sent Deloitte files to his personal phone by iMessage—including at least five .zip archives, two of them password-protected. He also stored proprietary AI product files in a personal Apple iCloud account.

9. The files Niyazov took include more than 600 files with the Deloitte proprietary AI tool in the file names; approximately 2,100 files containing data extracted from Deloitte's Microsoft Outlook system using custom scripts; and more than 300 audio and video recordings of meetings and calls, many of which Niyazov admitted he recorded without the knowledge or consent of the other participants.

10. Niyazov planned his scheme in advance. The forensic evidence indicates that he configured the microSD card for use with the Sony recorder on March 11, 2026—five days before his engagement with Deloitte began.

11. Niyazov worked to conceal what he was doing. He staged files for transfer in a folder that he created at the root of his laptop's hard drive, an atypical location that Deloitte's backup tools do not capture; ran portable archiving software from the card so that it would leave no trace on his Deloitte laptop; packaged Deloitte data into password-protected archives; and sent archives of Deloitte data to his personal phone by iMessage. On his last day, he emptied the Trash on his Deloitte MacBook.

12. Niyazov's web activity during the period further demonstrates his improper purpose and efforts to conceal his theft. He searched for and downloaded portable applications that he used to create password-protected archives of Deloitte's confidential material. On or about April 20, 2026, with the transfers under way, he searched for "micro sd max size," "fastest SD card speed," and "SD Express card" and visited product pages for SD cards. Ten days later, on or about April 30, 2026, he searched for "faraday cage seams." A Faraday cage is an enclosure used to keep a device from being located, accessed, or wiped remotely. Niyazov also searched for "how to download meeting recording from Teams," "fastest video transcription library Python," and a "chrome extension to download microsoft teams videos"—searches that track his harvesting and transcription of recorded meetings.

13. Deloitte has recovered only the microSD card and the two Deloitte laptops that Niyazov used. Several of the archives on the microSD card are password-protected and inaccessible.

14. Deloitte has not recovered the Sony recorder, to which Niyazov transferred Deloitte's confidential and proprietary files; a non-Deloitte Apple computer to which he connected the microSD card; his personal phone to which he sent Deloitte's confidential and proprietary information; or the personal Apple iCloud account in which he stored Deloitte's confidential and proprietary files.

15. Niyazov has retained counsel. On October 23, 2026, Deloitte identified these specific devices and accounts to Niyazov's counsel and asked that Niyazov preserve them and provide Deloitte access to them for forensic imaging and recovery of Deloitte's confidential and proprietary information. Deloitte also asked for the passwords to Niyazov's password-protected archives. Niyazov has not done so, and he has not agreed to a neutral forensic examination.

16. Throughout his Deloitte engagement, Niyazov was, and remains, the founder and chief executive of Oasis Action, a New York business which, upon information and belief, he owns and controls, and of which he is the sole officer and employee. Oasis Action is a technology company that Niyazov founded in March 2025 to develop software products and potentially compete with Deloitte's proprietary AI product.

17. Deloitte thus files this lawsuit seeking injunctive and equitable relief to prevent Defendants and anyone acting in concert with them from using or disclosing Deloitte's information, to obtain the return and destruction of every copy of it, to obtain a full accounting of where it has gone, and to verify through a forensic examination that no copies remain.

18. Deloitte also seeks compensatory damages for Niyazov's breaches of the Confidentiality Agreement.

## **PARTIES**

19. Plaintiff Deloitte Services LP ("Deloitte Services") is a limited partnership organized and existing under the laws of the State of Delaware, with an office at 30 Rockefeller Plaza, New York, New York 10112.

20. Plaintiff Deloitte Development LLC ("Deloitte Development") is a limited liability company organized and existing under the laws of the State of Delaware, with an office at 30

Rockefeller Plaza, New York, New York 10112. Deloitte Development owns the intellectual property in Deloitte's proprietary AI product, including the trade secrets described below. Deloitte Development is an affiliate of Deloitte Services. Deloitte Development is one of the "Deloitte U.S. Firms" whose information the Confidentiality Agreement protects, and it is an intended beneficiary of that agreement.

21. Plaintiff Deloitte Consulting LLP ("Deloitte Consulting") is a limited liability partnership organized and existing under the laws of the State of Delaware, with an office at 30 Rockefeller Plaza, New York, New York 10112. Deloitte Consulting markets and implements Deloitte's proprietary AI product and would be harmed by an unlawful competing product. Deloitte Consulting is one of the "Deloitte U.S. Firms" whose information the Confidentiality Agreement protects, and it is an intended beneficiary of that agreement.

22. Defendant Artur Niyazov is an individual who, upon information and belief, resides in New York, and is a citizen of New York. Niyazov performed services for Deloitte as a contractor from March 16, 2026, until June 24, 2026, when he surrendered his Deloitte-issued devices. Deloitte terminated his engagement on June 27, 2026.

23. Defendant Oasis Action LLC is, upon information and belief, a limited liability company organized under the laws of the State of New York, with its principal place of business in New York, New York. Niyazov holds himself out publicly as the "Founder and CEO" of Oasis Action, a full-time, on-site position in New York that he represents he has held since March 2025—a year before Deloitte re-engaged him—and that he held throughout his engagement with Deloitte. Upon information and belief, Niyazov owns and controls Oasis Action, is its sole officer and employee, and directs all its activities, such that his knowledge and conduct are the knowledge and conduct of Oasis Action.

**JURISDICTION AND VENUE**

24. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq.*

25. This Court has supplemental jurisdiction over Deloitte's state-law claims pursuant to 28 U.S.C. § 1367(a).

26. The Court has personal jurisdiction over Niyazov because he resides and is domiciled in New York, performed services for Deloitte in New York, and the acts giving rise to this action occurred in New York.

27. The Court has personal jurisdiction over Oasis Action because it maintains its principal place of business in New York and conducts business in New York, and because its founder, chief executive, and sole officer, Niyazov, resides in New York and undertook the conduct alleged in this complaint in New York.

28. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Deloitte's claims occurred in this District, Niyazov was assigned to Deloitte's office in Manhattan, and Deloitte Services maintains an office in Manhattan.

## GENERAL ALLEGATIONS

### A. Deloitte Develops an Innovative, Proprietary, Cutting-Edge AI Product Using More than $70 Million and Many Thousands of Man Hours

29. Deloitte Services provides services to other Deloitte affiliates, including by engaging contractors to perform services for those affiliates. Deloitte Development owns the intellectual property in Deloitte's proprietary AI product, which Deloitte offers to clients throughout the United States and around the world.

30. In March 2025, Deloitte publicly launched its proprietary AI product, an AI platform that offers a suite of AI "agents" that perceive, reason, and act to execute complex business functions autonomously. Deloitte's proprietary AI product offers agents for business functions including finance, human capital, supply chain, procurement, sales and marketing, and customer service.

31. Deloitte built its proprietary AI product, over more than two years and through successive client deployments, as an enterprise platform in which autonomous agents carry out

end-to-end business processes—reading a client's data, reasoning over it, and taking action in the client's systems—within controls that make the results reliable enough for a client's finance, supply-chain, or procurement function to depend on. Doing so required Deloitte to design its own agent architecture: a skill-based platform architecture and an agent orchestration engine that decompose a business process into tasks, assign them to specialized agents, and govern how those agents call models, retrieve data, and hand off work to one another; domain-specific data schemas and data dictionaries that translate a client's financial and operational data into forms the agents can use; security, guardrail, and evaluation frameworks that keep agent behavior within defined boundaries and allow Deloitte to verify outputs before they reach a client; and a development kit, reference architectures, and reusable assets that allow Deloitte's engineers to build and deploy new agents on the platform consistently, including on clients' own private-cloud infrastructure. Deloitte also developed the methodology for putting the platform into production—the deployment guides, pilot playbooks, quality gates, and staffing models that its Forward Deployed Engineering ("FDE") teams use to integrate Deloitte's proprietary AI product with a client's enterprise systems and move an agent from pilot to production in a matter of weeks—and the pricing and packaging models through which it offers the platform. Each of those elements reflects design choices Deloitte made and refined through its experience and trial and error, and none of them is published or available outside Deloitte. That accumulated and specialized architecture, design, and deployment knowledge is what distinguishes Deloitte's proprietary AI product from generic AI tools.

32. Deloitte's AI's agents integrate with enterprise systems and workflows. Deloitte's FDE organization deploys Deloitte's proprietary AI product for Deloitte's clients, with teams in the United States, Europe, the Middle East, Africa, and the Asia-Pacific region.

33. Deloitte has invested substantial resources in developing its proprietary AI product, including more than $70 million and the work of more than 170 developers.

34. In developing and deploying its proprietary AI product, Deloitte has generated a large body of confidential and proprietary information, including (a) the technical architecture and

design of the product and its agents; (b) product requirements documents, prompt libraries, data dictionaries, data schemas, and product roadmaps; (c) methodologies, playbooks, and guides for deploying the product; (d) pricing models, sales pipeline information, and internal sales materials; (e) internal organizational and staffing information; and (f) internal communications and meetings discussing confidential information concerning the product's development, strategy, and client engagements. This information is not publicly available, and would be valuable to Deloitte's competitors, who could use it to develop, price, and deploy competing AI offerings without investing the time and resources that Deloitte invested.

35. In the course of deploying its proprietary AI product, Deloitte also receives confidential information from its clients, which Deloitte is obligated to protect.

### B. Deloitte Takes Extensive Measures to Protect Its Confidential Information, Including Information Concerning Its AI Product

36. Deloitte takes extensive measures to protect the secrecy of its confidential information, including information concerning its proprietary AI product.

37. Deloitte Services' agreement with TCWGlobal, the staffing agency through which Niyazov was engaged, required Niyazov to execute a Deloitte-provided confidentiality and non-disclosure agreement, a privacy notice, and a system user agreement before performing any services, and complete Deloitte's confidentiality and other required training within fourteen business days of beginning work.

38. Deloitte requires contractors (and required Niyazov) to complete mandatory training courses on, among other things, confidentiality, cybersecurity, and the use of AI. Deloitte's contractor onboarding course instructs contractors, among other things, to "[o]nly use Deloitte-issued devices or approved devices to process, store, and transmit Deloitte or client data"; to "not install unapproved software"; and, when working outside the office, to "[a]void using external storage media devices unless provided/approved by Deloitte to save client or Deloitte information."

39. Deloitte requires its employees to complete similar mandatory training courses on confidentiality, cybersecurity, and the use of AI.

40. Deloitte also provides contractors (and provided Niyazov) with written guidance titled "Protect Deloitte and Client Confidential Information (CI)" (the "CI Guidance"). The CI Guidance explains that "[c]ontractor confidentiality obligations prohibit taking Deloitte and client confidential information and uploading or storing such information on non-Deloitte or non-client devices or systems," and that, "[b]oth during and after your association with Deloitte, you may not take or retain any Deloitte confidential information."

41. The CI Guidance also prohibits "[r]etaining confidential information on a personal computing, mobile, or storage device that has not been approved for Deloitte use" and "[u]ploading or transferring confidential information to any Artificial Intelligence (AI) platforms or tools that have not been approved for conducting business."

42. Deloitte also uses technical measures to protect its information. Deloitte restricts the use of USB storage devices on its laptops, and employees and contractors may not transfer Deloitte information to removable media without an approved exception. Deloitte also prohibits employees and contractors from installing unapproved software and restricts the use of AI tools that have not been approved for the user, and it uses data loss prevention software to monitor and log the transfer of files from its laptops to external devices.

43. Deloitte also restricts access to AI materials to the individuals who work on its proprietary AI product and need to access those materials to perform their work. Individuals are required to have Deloitte credentials to access Deloitte's laptops and systems. Only individuals who work on Deloitte's proprietary AI product are granted access to the product's SharePoint site and permitted to be on calls relating to the product.

**C. Deloitte Engages Niyazov to Lead the AI Product's Forward Deployed Engineering Function**

44. Niyazov worked for Deloitte as an employee from November 2008 until May 2023, and then as a contractor from May 2023 until July 2024.

45. On March 16, 2026, Deloitte again engaged Niyazov as a contractor, through his employer, TCWGlobal.

46. Deloitte engaged Niyazov to serve as the Lead of its AI product's FDE organization. In that role, Niyazov's responsibilities included defining the charter and operating model of the product's global FDE organization; creating standardized implementation playbooks, reference architectures, and reusable assets for product deployments; overseeing client implementations of the product; serving as executive technical lead on priority client engagements; translating lessons from the field into requirements for the product roadmap; and ensuring that implementations aligned with Deloitte's security requirements, data handling standards, and AI governance expectations.

47. Niyazov's role gave him access to highly confidential information concerning Deloitte's proprietary AI product, including information about its architecture, design, product documentation, prompt libraries, data dictionaries, data schemas, product roadmaps, deployment methodologies, playbooks, guides, pricing models, internal communications, and client engagements.

48. As part of Niyazov's engagement, Deloitte issued him an HP laptop and, on March 26, 2026, shipped him a second laptop, an Apple MacBook Air.

49. On March 13, 2026, before his engagement began, Deloitte sent Niyazov an onboarding email to his Deloitte email address. The email attached the CI Guidance and directed Niyazov to complete Deloitte's mandatory contractor onboarding and AI training courses within fourteen days of his start date.

50. On March 17, 2026, Niyazov completed Deloitte's contractor onboarding and AI training courses.

**D. Niyazov Agrees to Protect Deloitte's Confidential Information**

51. On March 16, 2026, Niyazov executed the Confidentiality Agreement.

52. In the Confidentiality Agreement, Niyazov acknowledged that, in performing his services, he would "have access to proprietary and confidential information of the Deloitte U.S.

Firms or Deloitte Clients and to information technology resources," and that "[a]ny such access must only be used for legitimate business purposes." Ex. A at 1.

53. The Confidentiality Agreement defines the "Deloitte U.S. Firms" to mean "Deloitte Services LP and/or its affiliates." *Id.* It provides that it "shall benefit and be binding upon [Niyazov] and Deloitte Services LP and its affiliates." *Id.* § 6. The privacy notice that Niyazov signed together with the Confidentiality Agreement defines the "Deloitte U.S. Firms" to include Deloitte Services LP, Deloitte Consulting LLP, and other Deloitte entities "and their respective affiliates." *Id.* at 5.

54. The Confidentiality Agreement defines "Information" broadly to mean "any information or materials containing, consisting of or derived from confidential or proprietary information of, about or relating to the Deloitte U.S. Firms, the Other Deloitte Entities . . . or Deloitte Clients, including, without limitation, any information concerning the business, plans, operations, products, methods, methodologies, procedures, customers, clients, services, equipment, systems, and facilities and proprietary information of the Deloitte U.S. Firms, the Other Deloitte Entities or Deloitte Clients, whether in writing or otherwise." *Id.* § 1(a).

55. Niyazov agreed that all information disclosed to him in connection with his services "shall be and remain the property of the applicable Deloitte U.S. Firms or Deloitte Clients and shall be used only to the extent necessary for the performance of [his] Services and may not be duplicated for or disclosed to any third party, including other Consultant personnel, except as directed by the Deloitte U.S. Firms." *Id.*

56. Niyazov agreed that, "[u]pon completion of performance or termination of [his] Services," he "shall deliver to an authorized representative of the Assigned Deloitte U.S. Firm all Information, including any notes, extracts, diagrams or other documents or materials containing such Information that is in [his] possession or control," and that, "[a]t the request of the Assigned Deloitte U.S. Firm, [he] shall certify that all such Information and materials have been returned." *Id.* § 1(b).

57. Niyazov agreed that he "shall not use any Information to invent, create, modify, adopt or manufacture any services or products that may compete with or replace any services or products of the Deloitte U.S. Firms, the Other Deloitte Entities or any Deloitte Client." *Id.* § 1(c).

58. He further agreed that these restrictions "shall apply, notwithstanding the completion or the termination of [his] Services, until such time as [he] can establish that such Information is known to the general public, provided such knowledge by the general public is not due to [his] acts or omissions." *Id.* § 1(d).

59. Niyazov agreed that he "shall not store any PII or Information on a mobile device (e.g., laptop computer, Smartphone, jump drives, CD, DVD, etc.) or other electronic device (e.g., home computer) unless the device is Equipment," meaning a device provided to him by Deloitte; that "[s]ecurity tools on Equipment, such as encryption tools or security settings, must not be deactivated, modified or otherwise rendered ineffective or less effective by [him]"; and that he "shall not transfer any Information, including, without limitation, any PII, off the Deloitte network." *Id.* § 2(c).

60. The Confidentiality Agreement defines "PII" to include "information relating to an identified or identifiable natural person" that Niyazov acquired in connection with his services, including a person's "name" and any "photograph or video identifiable to an individual." *Id.* § 2(a).

61. Niyazov agreed that, promptly upon the termination of his services, all PII in his possession or control would be "destroyed in a manner that prevents its recovery or restoration" or returned to Deloitte, "in each case, without [his] retaining any actual or recoverable copies thereof." *Id.* § 2(f).

62. Niyazov agreed to notify Deloitte "immediately after [he] become[s] aware of any potential, actual or suspected misappropriation or unauthorized access to, or disclosure or use of, PII or Information . . . (collectively, 'Security Breach')"; to "assist the Deloitte U.S. Firms . . . in connection with any investigation that the Deloitte U.S. Firms may desire to conduct with respect

to such Security Breach"; and to "take all steps requested by the Deloitte U.S. Firms to limit, stop or otherwise remedy any potential, actual or suspected Security Breach." *Id.* § 2(e).

63. Niyazov further agreed to use his access to Deloitte's information technology resources "in the manner prescribed by the policies and procedures of the Deloitte U.S. Firms, including without limitation, maintaining the confidentiality of any information obtained or derived from such access," *id.* § 4, and to "provide the Assigned Deloitte U.S. Firm with information as may be reasonably requested . . . with regard to [his] compliance with the obligations under this Agreement," *id.* § 5.

64. The Confidentiality Agreement was not the first time Niyazov agreed to abide by Deloitte's confidentiality requirements. Throughout his prior fifteen years at Deloitte, as an employee and then as a contractor, Niyazov was subject to Deloitte policies and training that required him, among other things, to use, store, and transmit Deloitte information only through Deloitte-approved devices and systems, not to remove or retain it, not to install unapproved software, and not to circumvent Deloitte's security controls.

### E. Niyazov Copies Thousands of Confidential Deloitte Files Concerning Deloitte's Proprietary AI Product to Personal Storage Devices

65. Deloitte's forensic examination of Niyazov's microSD card revealed that—five days before his engagement with Deloitte began—Niyazov had configured the card to be used with a Sony digital voice recorder. Specifically, a configuration file on the microSD card that was created on March 11, 2026, identifies a Sony digital voice recorder and specifies the recorder's save path for voice recordings.

66. Within the first few days of his engagement, Niyazov, in violation of Deloitte's policies concerning use of AI tools and without its approval, downloaded and installed AI applications on his Deloitte-issued HP laptop, including the desktop applications for ChatGPT and Claude. He also downloaded the installer for Obsidian, a note-taking application that Deloitte has not approved.

67. On March 22, 2026—six days after his engagement began—Niyazov connected the Sony recorder to the HP laptop for the first time. Niyazov used the Sony recorder, with the microSD card inserted, as a storage drive to evade Deloitte's restrictions on the use of USB storage devices.

68. On March 25, 2026, Niyazov created a folder named "xfr" at the root of the HP laptop's hard drive. Forensic evidence indicates that Niyazov used the "xfr" folder to stage Deloitte files for transfer: its subfolders and files also appear on the microSD card and in the destination paths recorded in Deloitte's data loss prevention log. The "xfr" folder included presentations and documents related to Deloitte's proprietary AI product.

69. The same day, March 25, 2026, Niyazov loaded portable versions of 7-Zip (a file-archiving program) and Notepad++ (a text editor) onto the microSD card. Portable applications run directly from an external storage device without being installed on the host computer. This allows a user to bypass certain restrictions on installing software and reduces the forensic traces left on the host computer. Browser history on the HP laptop shows that Niyazov searched the web for a "7-Zip no-install version" before downloading a portable copy of 7-Zip to the HP laptop, which he then transferred to the microSD card.

70. Forensic artifacts also indicate that, on March 25, 2026, the microSD card was connected to a computer running Apple's macOS operating system. That computer could not have been a Deloitte-issued MacBook because Deloitte did not send Niyazov a MacBook until March 26, 2026. The forensic evidence shows that, between March 25 and April 2, 2026, Niyazov caused 2,667 transfers of files from the HP laptop to the microSD card through the Sony recorder.

71. The forensic evidence shows that, between April 14 and June 16, 2026, Niyazov caused 626 additional transfers of files from the MacBook to the Sony recorder and the microSD card, including 114 transfers through a USB card reader.

72. The files Niyazov transferred include a wide range of Deloitte's confidential information, much of it concerning Deloitte's proprietary AI product, including, for example:

(a) Technical architecture and design documents;

(b) Product requirements documents, data dictionaries, and roadmaps;

(c) Deployment methodologies and playbooks;

(d) Pricing and sales strategy materials and models;

(e) Organizational and staffing information; and

(f) Materials prepared for and containing confidential information regarding Deloitte's client engagements.

73. Separately and additionally, Niyazov harvested data from Deloitte's Microsoft Outlook email and calendaring system. Forensic evidence indicates that Niyazov ran a custom PowerShell script to extract data from Outlook and custom Python scripts to convert that data into text files, which were organized into folders labeled "meetings," "messages," "people," "clients," "relationships," "subjects," "topics," and "threads." Niyazov transferred approximately 2,100 of these files to the microSD card, including more than 960 files in folders labeled "meetings," more than 760 files in folders labeled "messages," and more than 300 files in folders labeled "people."

74. Moreover, during his engagement, Niyazov used the Sony recorder to record internal meetings. Niyazov admitted to doing so without the knowledge or consent of the other participants. Niyazov took steps to convert those recordings into text. He transferred to the microSD card a script titled "transcribe_teams_recordings," and he searched the web for "how to download meeting recording from Teams," "fastest video transcription library Python," and "chrome extension to download microsoft teams videos." Niyazov transferred to the microSD card and/or Sony digital voice recorder more than 300 audio and video recordings of meetings and calls he recorded, including recordings of internal AI product meetings with titles relating to Deloitte's proprietary AI product; recordings of one-on-one conversations between Niyazov and other Deloitte personnel; and recordings of meetings concerning Deloitte's client engagements.

75. The microSD card also contains at least seven password-protected .zip archives, six of which are dated between April 27 and June 15, 2026. Five of those contain folders labeled "recording," "summaries," "transcripts," and "outlook-items," and the sixth contains folders

labeled “outlook-teams” and “teams-recordings.” Another, titled “toolkit.zip,” contains an archive named after Deloitte’s proprietary AI tool.

76. Niyazov also sent Deloitte’s confidential information to his personal phone, by using iMessage on the MacBook to send messages to himself at a personal phone number. Beginning on or about April 9, 2026, those messages increasingly included .zip archives and Microsoft Office documents as attachments, generally with no text. Five .zip archives were sent this way, two of which appeared to be password-protected; one contains a folder labeled “knowledge-base” and the other a folder labeled “email-comms,” each with subfolders that, according to Deloitte’s forensic analysis, were generated by Niyazov’s Outlook-extraction scripts. Approximately 88 of the iMessages that Niyazov sent contained content related to Deloitte or its proprietary AI product in the body of the message.

77. Niyazov also used an Apple iCloud account to hold Deloitte files. In March and April 2026, Niyazov downloaded Deloitte and proprietary AI product files from iCloud to his Deloitte laptops.

78. Niyazov never had authorization to copy Deloitte’s information onto the Sony recorder or the microSD card, to connect them to a non-Deloitte computer, to send Deloitte’s information to his personal phone or cloud storage account, or to record meetings without the knowledge or consent of the participants. In doing so, he violated the Confidentiality Agreement and Deloitte’s policies, and in many instances bypassed Deloitte’s security controls.

**F. Niyazov Conceals His Activity and Destroys Evidence**

79. Niyazov’s activity further demonstrates his efforts to extract Deloitte’s confidential information, conceal his activity, and destroy evidence.

80. Niyazov staged files for transfer in a folder that he created at the root of his HP laptop’s hard drive—an atypical location that Deloitte’s backup tools do not capture; ran portable archiving software from the microSD card so that it would leave no trace on his Deloitte laptops; packaged Deloitte data into password-protected archives that Deloitte cannot open; and sent

archives of Deloitte data to his personal phone by iMessage. Each of those steps served to conceal what he was taking and where it went.

81. After transferring numerous files, on or about April 20, 2026, he searched the web for “micro sd max size,” “fastest SD card speed,” and “SD Express card,” and visited product pages for SD cards. These searches indicate that Niyazov sought additional storage capacity to hold transferred Deloitte files.

82. On or about April 30, 2026, Niyazov searched the web for “faraday cage seams.” A Faraday cage is an enclosure that holds devices and blocks wireless signals. Such enclosures are used to prevent a device from being located, accessed, or wiped remotely.

83. On June 24, 2026—his last day—Niyazov emptied the Trash on his Deloitte MacBook. Because of the manner in which macOS handles deletion, Deloitte’s forensic examiners were unable to identify the files he deleted.

**G. Niyazov Refuses to Return and Destroy Deloitte’s Information**

84. After Deloitte terminated Niyazov’s engagement, Deloitte asked Niyazov to certify that he had returned or destroyed all of Deloitte’s information, as the Confidentiality Agreement requires. Ex. A §§ 1(b), 2(f). Niyazov has refused to do so. To date, he has not signed any certification that he has returned or destroyed Deloitte’s information.

85. While Deloitte sought that certification, Deloitte’s forensic examiners imaged the two Deloitte laptops that Niyazov had used and the microSD card.

86. The forensic evidence shows that Niyazov continues to possess devices and accounts containing Deloitte’s information, including proprietary AI product files. Specifically, Deloitte has not recovered the Sony recorder, to which Niyazov transferred confidential proprietary AI product files; a non-Deloitte Apple computer to which he connected the microSD card; his personal phone to which he sent confidential proprietary AI product information; or the personal Apple iCloud account in which he stored confidential proprietary AI product files.

87. Niyazov has since retained counsel. On October 23, 2026, Deloitte’s in-house counsel spoke with Niyazov’s counsel and, by email the same day, identified these specific devices

and accounts and asked that Niyazov preserve them, make them available to Deloitte for forensic imaging and recovery of Deloitte's information, and provide the passwords to fourteen password-protected archives. Deloitte asked that Niyazov state within five business days whether he would comply. Niyazov has not done so. Although Deloitte's counsel and Niyazov's counsel then discussed a protocol for a neutral forensic examination, Niyazov has not agreed to one, and his counsel has not responded to Deloitte since November 6, 2026.

### H. Defendants' Continued Possession of Deloitte's Information Threatens Deloitte with Irreparable Harm

88. Deloitte has recovered only the microSD card and the Deloitte laptops that were issued to Niyazov. Copies of Deloitte's information remain beyond Deloitte's reach, including on (a) the Sony recorder, to which Niyazov transferred files, including five .zip archives; (b) the personal Apple computer and any other device or repository to which Niyazov connected the microSD card; (c) Niyazov's personal phone, to which he sent .zip archives, documents, and messages containing Deloitte information; and (d) Niyazov's iCloud account.

89. Deloitte also cannot review the contents of the password-protected archives that Niyazov created or determine where copies of them have gone.

90. Niyazov's refusal to certify that he has returned or destroyed Deloitte's information and refusal to provide the devices and accounts that Deloitte identified leave Deloitte with no assurance that its information is secure.

91. Niyazov is the founder, chief executive, and, upon information and belief, sole officer and employee of Oasis Action—a position he held throughout his Deloitte engagement and holds today. Upon information and belief, Niyazov owns and controls Oasis Action; any Deloitte information in his possession is available to Oasis Action; and Oasis Action, through Niyazov, knows that the information was acquired in breach of his obligations to Deloitte. Oasis Action is thus a ready vehicle through which the information Niyazov took can be put to use.

92. Browser history on Niyazov's Deloitte laptops also shows that, during his engagement, he accessed AI chat sessions with titles including "POC preparation deck and

timeline," "Naming an agentic AI proof-of-concept," and "CEO deck structure for 30-60 day plan." Deloitte did not assign Niyazov any of that work. These chat sessions indicate that Niyazov was preparing to use Deloitte's information to develop a competing agentic AI offering, potentially through Oasis Action.

93. The information Niyazov took would allow a competitor to replicate the architecture, deployment methodology, and pricing of Deloitte's proprietary AI product without investing the time and resources that Deloitte has invested and would expose confidential information that Deloitte's clients entrusted to it, as well as the personal information of Deloitte personnel and others captured in the Outlook data and recordings that Niyazov took.

94. Once disclosed, that information cannot be made confidential again, and the resulting harm to Deloitte could not be fully remedied by money damages.

95. Deloitte thus brings this lawsuit to obtain injunctive relief that will prevent Defendants or anyone acting in concert with them from using or disclosing its information, secure the return and destruction of every copy, and establish, through a forensic examination and a sworn accounting, where Deloitte's information has gone.

## <u>FIRST CAUSE OF ACTION</u>

**(Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* — Against All Defendants)**

96. Deloitte incorporates all other allegations in this complaint.

97. Deloitte Development owns trade secrets concerning Deloitte's proprietary AI product, including (a) the technical architecture and design of the platform and its agents; (b) product requirements documents, data dictionaries, data schemas, prompt libraries, and product roadmaps; (c) Deloitte's methodologies, playbooks, and guides for deploying the product; (d) Deloitte's pricing models, pricing strategy, sales pipeline information, and internal sales materials for the product; and (e) any and all of the foregoing proprietary information discussed in internal product meetings (collectively, the "Proprietary AI Trade Secrets"). Deloitte Development is the owner of the Proprietary AI Trade Secrets within the meaning of 18 U.S.C. § 1839(4).

98. The Proprietary AI Trade Secrets are related to a product and service used in, and intended for use in, interstate and foreign commerce. Deloitte offers and deploys its proprietary AI product for clients throughout the United States and in other countries.

99. The Proprietary AI Trade Secrets derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who could obtain economic value from their disclosure or use, including Deloitte's competitors.

100. Deloitte has taken reasonable measures to keep the Proprietary AI Trade Secrets secret, including by requiring contractors and employees to execute confidentiality agreements such as the Confidentiality Agreement; requiring contractors and employees to complete training on confidentiality, cybersecurity, and AI use; providing contractors and employees with the CI Guidance; issuing contractors and employees Deloitte laptops; restricting access to the AI product's proprietary materials to the individuals who work on the product and need to know that information; restricting the use of removable storage devices and unapproved AI tools; prohibiting contractors and employees from installing unapproved software; and monitoring the transfer of files off its network.

101. The Proprietary AI Trade Secrets are restricted to the individuals who work on the proprietary AI product and need to access the Proprietary AI Trade Secrets to perform their work.

102. Niyazov misappropriated the Proprietary AI Trade Secrets by acquiring them through improper means, including theft, breach of his duty under the Confidentiality Agreement to maintain their secrecy, and espionage through electronic or other means, including by surreptitiously recording meetings, running custom scripts to extract Deloitte's Outlook data, using the Sony recorder to evade Deloitte's restrictions on USB storage devices, staging files for transfer in a folder that he created at the root of his laptop's hard drive, running portable archiving software from the microSD card so that it would leave no trace on his Deloitte laptop, packaging Deloitte data into password-protected archives, and sending archives of Deloitte data to his personal phone

by iMessage. Niyazov knew that he was not authorized to acquire the Proprietary AI Trade Secrets in this manner.

103. Niyazov also misappropriated the Proprietary AI Trade Secrets by using them without Deloitte's consent, including by processing them with custom scripts and with AI tools that Deloitte had not approved for his use to generate transcripts, summaries, and a searchable compilation of Deloitte's internal communications, which he stored on personal storage devices.

104. Upon information and belief, Niyazov has used or intends to use the Proprietary AI Trade Secrets for his own benefit and for the benefit of Oasis Action.

105. Niyazov continues to possess the Proprietary AI Trade Secrets without authorization, has refused to certify that he has returned or destroyed them, has refused to return the devices and accounts that contain the Proprietary AI Trade Secrets, and has sequestered them in password-protected archives that, upon information and belief, only he can open. Niyazov's continued possession of the Proprietary AI Trade Secrets constitutes a continuing and threatened misappropriation.

106. Upon information and belief, Oasis Action has acquired or has access to the Proprietary AI Trade Secrets through Niyazov, who holds himself out as its founder and chief executive officer. Because Niyazov is Oasis Action's founder, chief executive, and sole officer, his knowledge that the Proprietary AI Trade Secrets were acquired by improper means and in breach of his duty to maintain their secrecy is Oasis Action's knowledge, and his acquisition and possession of them in that capacity are Oasis Action's acquisition and possession. Oasis Action's acquisition of, access to, and ability to use the Proprietary AI Trade Secrets constitute an actual or threatened misappropriation within the meaning of 18 U.S.C. §§ 1836(b)(3)(A) and 1839(5).

107. Defendants' misappropriation was and is willful and malicious.

108. As a direct and proximate result of Defendants' actual and threatened misappropriation, Deloitte has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

109. Deloitte is also entitled to damages under 18 U.S.C. § 1836(b)(3)(B), and, because Defendants' misappropriation was willful and malicious, exemplary damages in an amount up to two times those damages under 18 U.S.C. § 1836(b)(3)(C), and reasonable attorney's fees under 18 U.S.C. § 1836(b)(3)(D).

110. Pursuant to 18 U.S.C. § 1836(b)(3)(A), Deloitte is entitled to preliminary and permanent injunctive relief to prevent any actual or threatened misappropriation of the Proprietary AI Trade Secrets, including an order requiring affirmative actions to be taken to protect them. That relief should require Defendants and their affiliates, entities, officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, to, among other things, (a) refrain from accessing, using, disclosing, or transmitting the Proprietary AI Trade Secrets; (b) preserve all devices, storage media, accounts, and files that contain or may contain the Proprietary AI Trade Secrets; (c) deliver the Sony recorder, Niyazov's phone and computers, any additional memory cards, and any iCloud, personal email, and AI accounts and all other storage media containing the Proprietary AI Trade Secrets to a neutral forensic examiner for forensic examination, and disclose the passwords to the encrypted archives; (d) return and then destroy, and certify the destruction of, all copies of the Proprietary AI Trade Secrets; (e) provide a sworn accounting of every copy of the Proprietary AI Trade Secrets they have made and identify all persons, entities, and platforms to which the Proprietary AI Trade Secrets have been disclosed or uploaded and cooperate in obtaining the return and destruction of all copies of Proprietary AI Trade Secrets; and (f) certify under penalty of perjury that they have done so.

## <u>SECOND CAUSE OF ACTION</u>

**(Breach of Contract — Against Artur Niyazov)**

111. Deloitte incorporates all other allegations in this complaint.

112. The Confidentiality Agreement is a valid and enforceable contract that Niyazov executed on March 16, 2026. It is supported by consideration, including Deloitte's engagement of Niyazov's services and the access Deloitte gave him to its information and systems.

113. New York law governs the Confidentiality Agreement. Niyazov executed it in connection with services that he performed for Deloitte in New York, where he resides and where Deloitte assigned him.

114. Deloitte Services is a party to the Confidentiality Agreement, which "shall benefit and be binding upon [Niyazov] and Deloitte Services LP and its affiliates." Ex. A § 6. Deloitte Development and Deloitte Consulting are affiliates of Deloitte Services, are included in the "Deloitte U.S. Firms" whose information the Confidentiality Agreement protects, and are intended beneficiaries of the Confidentiality Agreement.

115. Deloitte has performed all its obligations under the Confidentiality Agreement, including by giving Niyazov access to its information and systems and providing him with the equipment necessary to perform his services.

116. Under the Confidentiality Agreement, Niyazov agreed, among other things: (a) not to transfer Information off the Deloitte network; (b) not to store Information on any device other than equipment Deloitte provided to him; (c) not to deactivate, modify, or otherwise render ineffective or less effective the security tools on Deloitte's equipment; (d) to use Information only to the extent necessary for the performance of his services, and not to duplicate it for or disclose it to any third party; (e) to deliver all Information to Deloitte upon the completion or termination of his services and, at Deloitte's request, to certify that it had been returned; and (f) to assist in any investigation Deloitte conducts of a security breach, to take all steps Deloitte requests to remedy it, and to provide the information Deloitte reasonably requests regarding his compliance. Ex. A §§ 1(a)–(b), 2(c), 2(e), 5.

117. Niyazov violated each of these duties, and breached the Confidentiality Agreement by, among other things:

(a) Using and duplicating Deloitte's Information for purposes other than the performance of his services, including by copying thousands of Deloitte files to the Sony recorder and the microSD card, extracting and compiling Deloitte's Outlook data, and packaging Deloitte's Information into password-protected archives that,

upon information and belief, only he can open; and, upon information and belief, duplicating Deloitte's Information for, and making it available to, Oasis Action, a third party;

(b) Storing Deloitte's Information on devices that Deloitte did not provide to him, including the Sony recorder, the microSD card, his personal phone, and, upon information and belief, a non-Deloitte Apple computer;

(c) Transferring Deloitte's Information off the Deloitte network, including by copying it to the Sony recorder and the microSD card, sending it to his personal phone by iMessage, and maintaining it in his iCloud account;

(d) Upon information and belief, rendering Deloitte's security tools ineffective or less effective, including by using the Sony recorder to evade Deloitte's restrictions on USB storage devices and staging files in a folder that Deloitte's backup tools do not capture;

(e) Using his access to Deloitte's information technology resources in violation of Deloitte's policies and procedures;

(f) Failing to deliver all of Deloitte's Information to Deloitte upon the completion of his services, including the Sony recorder and the Information on his personal phone, personal computer, and iCloud account, and refusing to certify that he has returned it;

(g) Failing to destroy or return, without retaining any copies, the PII in his possession, including the names and contact information of Deloitte personnel and others contained in the Outlook data he extracted, and recordings of identifiable individuals;

(h) Failing to notify Deloitte of the security breach he caused, failing to assist Deloitte's investigation of it, and failing to take the steps Deloitte requested to remedy it, including by refusing to certify that he has returned or destroyed Deloitte's information; and

(i) Failing to provide the information Deloitte reasonably requested regarding his compliance with the Confidentiality Agreement.

118. As a direct and proximate result of Niyazov's breaches, Deloitte has suffered and will continue to suffer damages, as well as irreparable harm for which there is no adequate remedy at law.

119. Deloitte is entitled to specific performance of Niyazov's obligations under the Confidentiality Agreement, including an order requiring Niyazov to (i) return all Information in his possession or control; (ii) certify under penalty of perjury that all such Information has been returned; (iii) cooperate in Deloitte's investigation of the security breach he caused and take all steps Deloitte requests to remedy it; and (iv) provide a sworn accounting of whether, and with whom, he has shared any of Deloitte's Information.

120. Deloitte is also entitled to preliminary and permanent injunctive relief that requires Niyazov and his affiliates, entities, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, to, among other things, (a) refrain from accessing, using, disclosing, or transmitting Deloitte's Information; (b) preserve all devices, storage media, accounts, and files that contain or may contain Deloitte's Information; (c) deliver the Sony recorder, Niyazov's phone and computers, any additional memory cards, and any iCloud, personal email, and AI accounts and all other storage media containing Deloitte's Information to a neutral forensic examiner for forensic examination, and disclose the passwords to the encrypted archives; (d) return all of Deloitte's Information and then destroy all remaining copies; (e) identify all persons, entities, and platforms to which Deloitte's Information has been disclosed or uploaded and cooperate in obtaining the return and destruction of all of Deloitte's Information; and (f) certify under penalty of perjury that he has done so.

121. Deloitte is also entitled to compensatory damages for Niyazov's breaches of the Confidentiality Agreement in an amount to be determined at trial.

**<u>THIRD CAUSE OF ACTION</u>**

**(Misappropriation of Trade Secrets Under New York Common Law — Against Artur Niyazov)**

122. Deloitte incorporates all other allegations in this complaint.

123. Deloitte possesses trade secrets, including the Proprietary AI Trade Secrets. That information is not known outside of Deloitte, known within Deloitte only to the individuals who work on its proprietary AI product, protected by the measures described above, valuable to Deloitte and would be valuable to its competitors, was developed by Deloitte through the investment of substantial effort and resources, and could not be properly acquired or duplicated by others without comparable investment.

124. Niyazov used Deloitte's trade secrets in breach of the Confidentiality Agreement, in breach of the confidential relationship and duty he owed to Deloitte as a contractor entrusted with its information, and as a result of discovery by improper means. Among other things, Niyazov used Deloitte's trade secrets by processing them with custom scripts and with AI tools that Deloitte had not approved for his use to generate transcripts, summaries, and a searchable compilation of Deloitte's internal communications, which he stored on personal storage devices.

125. Upon information and belief, Niyazov has used or intends to use Deloitte's trade secrets for his own benefit and for the benefit of Oasis Action.

126. Niyazov's conduct was willful, malicious, and in knowing disregard of Deloitte's rights.

127. As a direct and proximate result of Niyazov's misappropriation, Deloitte has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law. Deloitte is entitled to preliminary and permanent injunctive relief to prevent Niyazov's further use or disclosure of its trade secrets and to secure their return and destruction.

**<u>FOURTH CAUSE OF ACTION</u>**

**(Unfair Competition Under New York Common Law — Against Artur Niyazov)**

128. Deloitte incorporates all other allegations in this complaint.

129. Deloitte has invested substantial labor, skill, and expenditures in developing its confidential and proprietary information concerning its proprietary AI product, including the Proprietary AI Trade Secrets and the other Information that Niyazov took.

130. Niyazov misappropriated that information in bad faith. Niyazov obtained it by stealth: upon information and belief, he routed the transfers through the Sony recorder to evade Deloitte's restrictions on USB storage devices and staged files in an atypical location that Deloitte's backup tools do not capture; he loaded onto the microSD card portable software that could be run without installation; he recorded meetings without the knowledge or consent of the participants; and he packaged Deloitte's information into password-protected archives.

131. Upon information and belief, Niyazov has exploited or intends to exploit Deloitte's confidential and proprietary information for his own commercial advantage, including in the business of Oasis Action, and to Deloitte's detriment.

132. As a direct and proximate result of Niyazov's unfair competition, Deloitte has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law. Deloitte is entitled to preliminary and permanent injunctive relief to prevent Defendants from exploiting its confidential and proprietary information.

## PRAYER FOR RELIEF

Deloitte requests the following relief:

1. A temporary restraining order, preliminary injunction, and permanent injunction that require Defendants and their affiliates, entities, officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, to:

   a. refrain from directly or indirectly accessing, using, disclosing, copying, transmitting, or otherwise disseminating any of Deloitte's trade secrets or confidential information, including any information contained in or derived from the files that Niyazov transferred from any Deloitte device or repository;

b. preserve, and refrain from deleting, altering, wiping, or destroying, all documents, files, data, devices, storage media, and accounts that contain or may contain Deloitte's trade secrets or confidential information, or that reflect their acquisition, use, or disclosure, including the Sony recorder, any other memory cards or storage devices, any personal computers and mobile phones, and any email, cloud-storage, messaging, and AI accounts;

c. deliver to a neutral forensic examiner, for forensic imaging, Niyazov's mobile phone and personal computers, the Sony recorder, any additional memory cards, and all other devices or storage media that contain or may contain Deloitte's trade secrets or confidential information; provide the neutral forensic examiner, under a protocol approved by the Court, with the access to Niyazov's personal iCloud, email, messaging, and AI accounts necessary to identify and remediate Deloitte's trade secrets and confidential information; and disclose to the neutral forensic examiner the passwords to all encrypted archives containing any such information;

d. return to Deloitte all documents, files, data, and materials (in whatever form, including electronic) containing or reflecting Deloitte's trade secrets or confidential information, and then destroy all copies thereof in their possession, custody, or control, including on any personal devices, storage media, cloud-storage accounts, email accounts, messaging accounts, or AI platforms;

e. provide a sworn accounting of every copy of Deloitte's trade secrets or confidential information they have made, and identify all persons, entities, and platforms (including AI platforms) to whom or to which they have disclosed, transferred, uploaded, or made available any of Deloitte's trade secrets or confidential information and cooperate in obtaining the return and destruction of any such materials; and

f. certify under penalty of perjury their compliance with the foregoing;

2. An order requiring Niyazov to specifically perform his obligations under the Confidentiality Agreement, including by returning all of Deloitte's Information, certifying its return, cooperating in Deloitte's investigation, and providing a sworn accounting of whether, and with whom, Niyazov has shared any of Deloitte's Information;

3. An award of compensatory damages in an amount to be determined at trial;

4. An award of exemplary damages in an amount up to two times those damages under 18 U.S.C. § 1836(b)(3)(C);

5. Reasonable attorney's fees under 18 U.S.C. § 1836(b)(3)(D);

6. An award of Deloitte's costs and pre- and post-judgment interest; and

7. Such other and further relief as the Court deems just and proper.

Dated: November 16, 2026

Respectfully submitted,

HUESTON HENNIGAN LLP

By: ______________________________

Moez M. Kaba
1 Little West 12th Street
New York, New York 10014
Telephone: (646) 930-0415
mkaba@hueston.com

Joseph A. Reiter [(*pro hac vice* forthcoming)]
Neil G. Anderson [(*pro hac vice* forthcoming)]
620 Newport Center Drive, Suite 1300
Newport Beach, California 92660
Telephone: (949) 229-8640
jreiter@hueston.com
nanderson@hueston.com

*Attorneys for Plaintiffs Deloitte Services LP, Deloitte Development LLC, and Deloitte Consulting LLP*